IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RYAN GRAHAM, an individual, and
the LIBERTARIAN PARTY OF
GEORGIA, INC., a Georgia
nonprofit corporation,

     Plaintiffs,

v.

                             CIVIL ACTION FILE

CHRISTOPHER M. CARR, in his        NO. 1:22-CV-3613-MHC
official capacity as Attorney General
of Georgia, JAMES D.
KREYENBUHL, in his official
capacity as chair of the Georgia
Government Transparency and
Campaign Finance Commission, and
the GEORGIA GOVERNMENT
TRANSPARENCY AND
CAMPAIGN FINANCE
COMMISSION,

     Defendants.

## ORDER

This case comes before the Court on Plaintiffs Ryan Graham ("Graham")

and the Libertarian Party of Georgia, Inc. ("Libertarian Party")'s Motion for

Preliminary Injunction ("Pls.' Mot.") [Doc. 4].

## I.     BACKGROUND

### A.     The Libertarian Party and Campaign Contributions in General

The Libertarian Party is a "political body" under Georgia law.  Compl. [Doc. 1] ¶ 17; O.C.G.A. § 21-2-2(23).  Under Georgia law, a political body may become "qualified to nominate candidates to statewide political office by convention" if (1) it submits a qualifying petition signed by at least one percent of the total number of registered voters at the last general election, or (2) it nominated a candidate for statewide public office in the last general election who received votes totaling at least one percent of the total number of registered voters in the election.  O.C.G.A. § 21-2-180.  Candidates for statewide offices nominated by a political body that are qualified under § 21-2-180 appear automatically on the general election ballot without a nomination petition.  O.C.G.A. § 21-2-132(e)(5).  It is undisputed that candidates of the Libertarian Party are qualified to appear on the ballot for statewide offices under O.C.G.A. § 21-2-180, having reached the one percent threshold since 1988.  See Cowan v. Raffensperger, 537 F. Supp. 3d 1327, 1330 (N.D. Ga. 2021), aff'd in part, rev'd in part and remanded sub nom. Cowen v. Sec'y of State of Ga., 22 F. 4th 1227 (11th Cir. 2022).

All candidates for statewide office and their campaign committees are limited in the amount of contributions they may accept from an individual

contributor.  Although the maximum allowable contribution in the last amendment

affecting the statutory contribution limits was $5,000 for a primary and general

election and $3,000 for a primary runoff and general runoff election, Ga. Laws

2000, p. 1491 (eff. Jan. 1, 2001), codified at O.C.G.A. § 21-5-41(a)(1) & (2), "the

contribution limitations in this Code section shall be raised or lowered in

increments of $100.00 by regulation of the commission pursuant to a determination

by the commission of inflation or deflation during such cycle or four-year period,

as determined by the Consumer Price Index published by the Bureau of Labor

Statistics of the United States Department of Labor, and such limitations shall

apply until next revised by the commission." O.C.G.A. § 21-5-41(k).  The current

contribution limits for candidates for statewide elected office are $7,600 for a

primary or general election and $4,500 for a primary runoff or general runoff

election.  See GEORGIA GOVERNMENT TRANSPARENCY & CAMPAIGN FINANCE

COMMISSION, www.ethics.ga.gov/contribution-limits (last visited Oct. 5, 2022).

### B.    The Law Authorizing the Creation of Leadership Committees

On July 1, 2021, a state law became effective which provided a new

mechanism by which certain Georgia public office holders may obtain

contributions for elective office.  Ga. Laws 2021, Act 219, § 1, eff. July 1, 2021.

The law, codified at O.C.G.A. § 21-5-34.2 (the "LC Statute"), provides, in

3

pertinent part, that "[a] leadership committee may accept contributions or make

expenditures for the purpose of affecting the outcome of any election or advocating

for the election or defeat of any candidate . . . ." O.C.G.A. § 21-5-34.2(d).  A

"leadership committee" is defined as follows:

> [A] committee, corporation, or organization chaired by the Governor, the Lieutenant Governor, the nominee of a political party for Governor selected in a primary election in the year in which he or she is nominated, or the nominee of a political party for Lieutenant Governor selected in a primary election in the year in which he or she is nominated.  Such term shall also mean up to two political action committees designated by the majority caucus of the House of Representatives, the minority caucus of the House of Representatives, the majority caucus of the Senate, and the minority caucus of the Senate.  No person may chair more than one leadership committee.

O.C.G.A. § 21-5-34.2(a).[1]

A leadership committee may begin to accept contributions prior to being

registered as such, but must register with the Georgia Government Transparency

and Campaign Finance Commission (the "Commission") within ten days of

---

[1] A "political party" is defined as any "political organization" which, at the preceding gubernatorial election, nominated a candidate for Governor who "polled at least 20 percent of the total vote cast in the state for Governor;" or which at the preceding presidential election nominated a candidate for President who "polled at least 20 percent of the total vote cast in the nation for that office." O.C.G.A. § 21-2-2(25).  Consequently, the only political parties in Georgia are the Democratic and Republican Parties.

beginning to accept contributions and must disclose contributions or expenditures in excess of $500.00:

> A leadership committee which accepts contributions or makes expenditures in excess of $500.00 shall register with the commission within ten days of such accepted contribution or such expenditure and, thereafter, shall file disclosure reports pursuant to the schedule defined for candidates and campaign committees in subsection (c) of Code Section 21-5-34. Such disclosure reports shall be made pursuant to subsection (b) of Code Section 21-5-34.

O.C.G.A. § 21-5-34.2(e). A key component of the LC Statute is that "[t]he contribution limits in Code Section 21-5-41 shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate or a group of named candidates," meaning that a leadership committee may accept contributions in any amount and is not bound by the current monetary limitation of $7,600 imposed upon candidates for statewide office and their campaign committees.

## B. Perdue v. Kemp

On January 6, 2022, former United States Senator David Perdue and his campaign committee, Perdue for Governor (collectively, "Perdue"), filed a complaint challenging the constitutionality of the LC Statute because it permitted Governor Brian Kemp ("Governor Kemp"), as the sitting governor, to raise and spend unlimited funds through Georgians First Leadership Committee, Inc.

5

("Georgians First") in the Republican Party primary election for governor while

Perdue could raise only a maximum of $7,600 from an individual contributor for

the same primary election.  See Perdue v. Kemp, 584 F. Supp. 3d 1310, 1316 (N.D.

Ga. 2022)  Initially, Perdue only named Governor Kemp, Attorney General

Christopher M. Carr, and the individual members of the Commission as

defendants, even though he was seeking to enjoin "the activity of any gubernatorial

leadership committee established" under the LC Statute.  Id., 584 F. Supp. 3d at

1320.  Because the scope of any injunctive relief would be limited to Georgians

First, which was not a party to the complaint, the Court granted Perdue time to file

an amended complaint to add Georgians First as a party to the litigation.  Id., 584

F. Supp. 3d at 1317.

On February 7, 2022, this Court found that Perdue was likely to succeed on

the merits of his claim that the LC Statute violated his rights under the First

Amendment because (1) the LC Statute effectively negated the contribution limit

imposed upon all candidates for Governor in the primary election for just one

candidate, Governor Kemp, through his leadership committee, Georgians First,

(2) the defendants failed to demonstrate a sufficiently important state interest to

support such a distinction, and (3) the statute was not closely drawn to serve any

such purported interest. Id. at *8-13.  The Court preliminarily enjoined Georgians

First

> from expending funds beginning on the date of this Order (1) for the
> purpose of advocating for the re-election of Governor Kemp or the
> defeat of an opponent of Governor Kemp through the 2022 primary
> election and 2022 primary runoff election, if any there be, or (2) to
> defray ordinary and necessary expenses incurred in connection with
> Governor Kemp's campaign for re-election as Governor of Georgia
> though the 2022 primary election and 2022 primary runoff election, if
> any there be, until further Order of this Court.

Id. at *14.  The injunction did not prevent Georgians First from continuing to

receive funds and make expenditures "in support of public officials other than

Governor Kemp" nor make unlawful any expenditures made prior to the Court's

Order to promote Governor Kemp's re-election or the defeat of an opponent of

Governor Kemp.  Id.  The injunction also imposed no restrictions on the members

of the Commission or the Attorney General of Georgia.

### C.    One Georgia v. Carr

On March 21, 2022, Stacey Y. Abrams ("Abrams") and One Georgia, Inc.

("One Georgia"), a leadership committee chaired by Abrams, filed a lawsuit

against the Attorney General of Georgia and the members of the Commission

challenging the constitutionality of the LC Statute which they argued was

"antithetical to the First Amendment."  One Georgia, Inc. v. Carr, No. 1:22-CV-

1130-MHC, 2022 WL 1284057, at *3 (N.D. Ga. Apr. 14, 2022).  Specifically, the

plaintiffs argued that the LC Statute permitted Governor Kemp, through Georgians First, to raise unlimited contributions to benefit his candidacy for Governor, but that Abrams was not permitted to raise funds through One Georgia until after the Democratic Party primary election occurred and this unconstitutional inequity was causing imminent and irreparable injury. Id. at *3-4.

> However, rather than seek to have [the] Court restrict Governor Kemp's ability to continue to raise unlimited contributions through Georgians First until and unless he [wa]s selected in the primary election as the Republican Party's nominee for Governor, Plaintiffs instead [sought] to have [the] Court immunize One Georgia from administrative action by the Commission if One Georgia [continued] to raise funds as Abrams's leadership committee prior to the primary election. Indeed, Plaintiffs [sought] to have [the] Court preliminarily enjoin Defendants "from engaging in investigatory or enforcement proceedings or sanctioning Plaintiffs for alleged violation of the LC Statute" by operating One Georgia as a leadership committee.

Id.

The Court found that the Abrams and One Georgia did not have standing to seek preliminary injunctive relief to preclude the Commission from enforcing the LC Statute because the injunctive relief sought "would do nothing to address Plaintiffs' allegations that the LC Statute unfairly allows Georgians First to raise unlimited contributions on behalf of Governor Kemp based solely on his status as Governor, and prior to his becoming the Republican Party nominee." Id. at *7. Notwithstanding the lack of standing, the Court analyzed the plaintiffs' motion for

preliminary injunctive relief and ruled that "[a]s did the plaintiffs in <u>Perdue v.</u>

<u>Kemp,</u> Plaintiffs in this case are likely to be able to show that the LC Statute as

applied is an impermissible infringement of Plaintiffs' First Amendment rights."

<u>Id.</u> at *11.

> However, the Court denied Plaintiffs' motion for a preliminary
> injunction directed solely to the Commission because (1) the injunctive
> relief sought would have required the Court to find that Abrams already
> is the Democratic Party nominee for Governor; (2) Georgia law is clear
> that political party candidates for public office are nominated in a
> primary (and makes no exceptions depending upon the number of
> candidates qualifying for the primary); and (3) Plaintiffs' requested
> relief would not address the purported unconstitutionality of the LC
> Statute, which is that Governor Kemp's leadership committee,
> Georgians First, is able to raise unlimited funds during a period when
> Abrams is not permitted to do so.

<u>One Georgia, Inc. v. Carr</u>, No. 1:22-CV-1130-MHC, 2022 WL 1284238, at *3

(N.D. Ga. Apr. 28, 2022).

Subsequently, Abrams and One Georgia amended their complaint to add

Georgians First as a party defendant and "[a]s an alternative to obtaining relief

against the Commission's enforcement of the LC Statute against them," the

plaintiffs amended the relief they sought in the complaint to enjoin Governor

Kemp's leadership committee, Georgians First, "from soliciting or receiving

contributions unless and until Governor Kemp becomes the Republican Party's

nominee for Governor." <u>Id.</u> at *3. Given the plaintiffs' new relief directed at

Governor Kemp's leadership committee which was added as a defendant to the

case, the Court found that the plaintiffs had standing, that they were likely to

succeed on the merits of their claim that the LC Statute as applied is an

impermissible infringement of their First Amendment rights, and granted the

motion for preliminary injunction, enjoining Georgians First "from soliciting or

receiving contributions until and unless Governor Brian Kemp becomes the

Republican Party nominee for Governor of Georgia in the 2022 primary election or

primary election runoff." Id. at *11. Once again, no relief was granted against

either the members of the Commission or the Attorney General of Georgia.

## D.    The Current Complaint

Like the plaintiffs in Perdue v. Kemp and One Georgia v. Carr, Plaintiffs

bring the above-styled lawsuit to challenge the constitutionality of the LC Statute,

which they contend violates Plaintiffs' First and Fourteenth Amendment rights.

Compl. ¶¶ 2, 21-22.  Specifically, Plaintiffs contend that the LC Statute permits the

Republican and Democratic Parties' nominees for statewide office to establish

leadership committees (thereby allowing them to raise funds in unlimited

amounts), but does not afford the same right to candidates of political bodies for

statewide office, like Graham, the Libertarian Party's nominee for Lieutenant

Governor, who is subject to the $7,600 limit. Id. ¶ 2.  Plaintiffs allege that, on June

17, 2022, Burt Jones ("Jones"), the Republican Party nominee for Lieutenant Governor, registered a leadership committee called the "WBJ Leadership Committee, Inc.," which has raised at least $60,000 in contributions that exceed the $7,600 limit. Id. ¶¶ 19-20. Graham has not set up a leadership committee, but alleges that he "wants to chair a leadership committee for the purpose of supporting Libertarian candidates for public office, including his own candidacy for Lieutenant Governor. He plans to run again as a Libertarian candidate for statewide public office in future elections." Id. ¶ 6.

However, rather than seek to have this Court restrict Jones's ability to continue to raise unlimited contributions through the WBJ Leadership Committee, the Complaint asks this Court to declare the LC Statute violative of Plaintiffs' First and Fourteenth Amendments as it applies to them and enjoin Defendants from enforcing the LC Statute "in a manner that violates the United States Constitution." Id. ¶ 2, Prayer for Relief ¶¶ 1-2. The Complaint does not specify what the sought-after relief would look like in practical terms. However, in their Motion for Preliminary Injunction, Plaintiffs state that they are seeking one of two alternatives: (1) an injunction to "prohibit the defendants from limiting leadership committees to the nominees of 'political parties,' as that term is defined in Georgia

11

law;" or (2) an injunction to "prohibit the defendants from enforcing the leadership committee statute in its entirety." Pls.' Mot. at 13.

## II.   STANDING

Defendants contend that Plaintiffs lack standing to bring their motion for injunctive relief against them. Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. ("Defs.' Opp'n") [Doc. 10] at 8-13. Defendants argue that Plaintiffs fail to demonstrate an injury in fact that is traceable to Defendants and they also fail to seek relief that is redressable by Defendants, none of whom "are given the statutory authority to declare that Graham is entitled to register his own leadership committee as the Libertarian Party's nominee for the office of Lieutenant Governor." Id. at 9.

Article III of the United States Constitution expressly limits federal jurisdiction to "cases and controversies" and does not permit federal courts to issue advisory opinions. Miller v. F.C.C., 66 F.3d 1140, 1145 (11th Cir. 1995) (citing Flast v. Cohen, 392 U.S. 83, 94-96 (1968)). "To have a case or controversy, a litigant must establish that he [or she] has standing," United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019), which requires the litigant to show (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). The three components form an "irreducible constitutional

minimum." Id. at 560. "The party invoking federal jurisdiction bears the burden of establishing these elements," which, at the initial pleading stage, may be established based on "general factual allegations of injury." Id. at 561.

## A.   Injury in Fact

In order to suffer an "injury in fact," (1) the injury "must be an invasion of a legally protected interest that is sufficiently concrete and particularized rather than abstract and indefinite," (2) "there must be a causal connection between the injury and the challenged action of the defendant that is not too attenuated," and (3) "it must be likely rather than speculative that the injury will be redressed by a favorable decision." Ga. State Conf. of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999) (citations and punctuation omitted).

Defendants argue that the Complaint merely alleges that Graham "wants to" establish a leadership committee, but Plaintiffs have failed to allege a real threat of immediate harm. Defs.' Opp'n at 9-10 (citing Fund For Louisiana's Future v. Louisiana Bd. of Ethics, No. 14-0368, 2014 WL 1514234, at *7 (E.D. La. Apr. 16, 2014) (finding that the plaintiff had sufficiently alleged an injury in fact where it had a identified a specific prospective donor who wanted to make a political contribution)). Plaintiffs argue that their injury in this case does not flow from the campaign contribution limits themselves, but from the campaign finance scheme

13

which establishes a regulatory framework in which candidates for the same office are subject to different limits. Pls.' Reply in Supp. of their Mot. for Prelim. Inj. ("Pls.' Reply") [Doc. 11] at 3 (citing One Georgia, Inc. v. Carr, 2022 WL 1284057, at *5). Nevertheless, Plaintiffs have also identified a prospective donor who "would like to contribute more than the current limit of $7,600 to support Graham's campaign." Decl. of Raymond Douglas Craig (Sept. 20, 2022) [Doc. 11-1] ¶ 5.

The Court agrees with Plaintiffs that they have alleged an injury in fact. In Davis v. Fed. Election Comm'n, 554 U.S. 724, 729 (2008), the Supreme Court considered a challenge to a federal statute providing that when a self-financing candidate expends more than $350,000 in personal funds, a competing candidate may raise three times the normal limit on contributions from individual donors. The Supreme Court found that the unequal treatment afforded by the statute was an injury sufficient to confer standing to a self-funded candidate to file a First Amendment challenge:

> Section 319(a) would shortly burden his expenditure of personal funds by allowing his opponent to receive contributions on more favorable terms, and there was no indication that his opponent would forgo that opportunity. Indeed, the record at summary judgment indicated that most candidates who had the opportunity to receive expanded contributions had done so. In these circumstances, we conclude that Davis faced the requisite injury from § 319(a) when he filed suit and

has standing to challenge that provision's asymmetrical contribution scheme.

Id., 554 U.S. at 734-35.

Similarly, in this case, Graham is unable to form a leadership committee and consequently unable to receive unlimited contributions in the same manner as Jones through the WBJ Leadership Committee, even though they are both running for the same office, because of the inequitable scheme which permits Jones to raise funds not subject to the individual contribution limits established by O.C.G.A. § 21-5-41(a), while Graham remains subject to those limits. The Court finds that Plaintiffs have alleged an injury in fact based on the unequal campaign finance scheme established by O.C.G.A. § 21-5-34.2.

## B.    Traceability

"To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.'" Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting Lujan, 504 U.S. at 560).

Defendants argue that the only allegation against Attorney General Carr is that he "is charged with enforcing the Georgia Government Transparency and Campaign Finance Act, of which [the LC Statute] is a part" and that this is

insufficient to meet the traceability requirement of standing.  Defs.' Opp'n at 10-12 (quoting Compl. ¶ 7).  Defendants further argue that although the Commission has the ability to institute enforcement proceedings for violations of the LC Statute, there is no allegation in the Complaint that any such enforcement proceeding has been filed or threatened.  Id.  In response, Plaintiffs argue that "the entities charged with enforcing campaign contributions limits are causing the injury," that Attorney General Carr and the Commission "together have that responsibility," and "Graham would face a credible threat of prosecution by these entities if he received political contributions over the applicable limit."  Pls.' Reply at 4.

The Court disagrees with Plaintiffs.  First, the statute establishing campaign contribution limits (O.C.G.A. § 21-5-41), is not the LC Statute at issue in this case, and Plaintiffs' Complaint fails to allege that O.C.G.A. § 21-5-41 is being applied by Defendants in an unconstitutional manner.  Additionally, the Complaint fails to allege that Defendants have instituted or threatened to institute any action to enforce the LC Statute against Plaintiffs.  In fact, the crux of Plaintiffs' Complaint is that the LC Statute does not apply to them because the only candidates for Lieutenant Governor who can form leadership committees are nominees of political parties.

Accordingly, as alleged in the Complaint and detailed in Plaintiffs' Motion for Preliminary Injunction, Plaintiffs have failed to allege any injury fairly traceable to the challenged action of any Defendant.

### C.    Redressability

Finally, Defendants contend that Plaintiffs' alleged injuries are not redressable by the injunctive relief sought against Defendants. Defs.' Opp'n at 12-13. Plaintiffs must prove that there is a substantial likelihood that their injuries would be redressed by a favorable decision on the merits. See Clapper v. Amnesty Int'l, USA, 568 U.S. 398, 410-14 (2013) (holding that it must be likely, not merely speculative, that the injury will be redressed by a favorable decision). Relief that prevents or deters violations from reoccurring satisfies the redressability requirement. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 185 (2000). However, "standing is not dispensed in gross," as "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Davis, 554 U.S. at 734 (internal punctuation and citations omitted); see also Friends of the Earth, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Plaintiffs seek an injunction prohibiting Defendants from enforcing the LC Statute "in a manner that violates the United States Constitution." Compl. ¶ 2,

Prayer for Relief ¶¶ 1-2.  Specifically, Plaintiffs have clarified that they are seeking an injunction that either: "(1) prohibit[s] the defendants from limiting leadership committees to the nominees of 'political parties,' as that term is defined in Georgia law; or (2) prohibit[s] the defendants from enforcing the leadership committee statute in its entirety."  Pls.' Mot. at 13.  Plaintiffs' alleged injury is that O.C.G.A. § 21-5-34.2 creates an inequitable and unconstitutional campaign finance scheme which permits Jones to raise funds through his leadership committee and avoid the individual contribution limits established by O.C.G.A. § 21-5-41(a), while Graham remains subject to those contribution limits because he is not the nominee for statewide office of a political party.  Neither of the alternative forms of injunctive relief sought by Plaintiffs would redress the alleged constitutional infirmity of the LC Statute.

First, there is no evidence, allegation, regulation, or statute which shows that the Commission or any named Defendant makes a determination as to who can form a leadership committee, so the Court could not enjoin Defendants from "limiting leadership committees to the nominees of 'political parties.'"  Which person may form a leadership committee is a matter of statute and that statute does not purport to give the Commission or any Defendant any discretion in the matter. See O.C.G.A. § 21-5-34.2.

Second, in seeking to have the Court enjoin the Commission from enforcing the plain language of Georgia law, Plaintiffs seek relief that fails to address the purported unconstitutionality of the LC Statute.  Rather than address the alleged unconstitutional inequity created by the application of the LC Statute whereby Jones is able to raise unlimited funds through his leadership committee during a time period when Graham is not permitted to form a leadership committee, the injunctive relief currently sought by Plaintiffs would require this Court to rewrite the LC Statute so that political body candidates for Lieutenant Governor, not just political party candidates for Lieutenant Governor, can form leadership committees.[2]  An injunction to prevent the Commission from undertaking any

---

[2] Plaintiffs contend that this Court can rewrite the LC statute, arguing that federal courts "modify state laws all the time." Pls.' Reply at 8 (citing, *inter alia*, Cooper v. Raffensperger, 472 F. Supp. 3d 1282, 1297 (N.D. Ga. 2020) and Green Party of Georgia v. Kemp, 171 F. Supp. 3d 1340, 1373 (N.D. Ga. 2016), aff'd, 674 F. App'x 974 (11th Cir. 2017)).  These cases are inapposite as they both focus exclusively on the Georgia statute establishing the number of signatures required for a nomination of a candidate by petition in Georgia, O.C.G.A. § 21-2-170.  The constitutional rights juxtaposed against the state interests in those cases, as well as the constitutional analysis involved, are distinguishable from those at issue in this case.  Additionally, neither case analyzed the issue of standing in general or redressability in particular.  Moreover, the courts in those cases did not rewrite any statute.  In Green Party of Georgia, the court enjoined Governor Kemp from enforcing the signature requirement against presidential candidates.  Green Party of Georgia, 171 F. Supp. 3d at 1374.  In Cooper, the court modified the statutory signature collection requirement to reduce it by 30% for one election cycle to

future enforcement action against Graham would do nothing to address Plaintiffs'

allegations that the LC Statute unfairly allows Jones to raise unlimited

contributions through his leadership committee. Consequently, the issuance of an

injunction to prohibit the Commission from engaging in investigatory or

enforcement proceedings against Plaintiffs would not redress the alleged

unconstitutionality of the LC Statute. Because the redressability requirement is not

satisfied, Plaintiffs lack standing to seek the requested injunctive relief.

Nevertheless, even if Plaintiffs could establish standing, the Court finds for

the reasons below that Plaintiffs cannot satisfy all of the prerequisites for the

issuance of a preliminary injunction.

## III.   MOTION FOR PRELIMINARY INJUNCTION

### A.   Legal Standard

In order to obtain a preliminary injunction, a plaintiff must demonstrate:

(1) a substantial likelihood of success on the merits; (2) that irreparable injury will

be suffered if the relief is not granted; (3) that the threatened injury outweighs the

harm the relief would inflict on the non-movant; and (4) that granting the relief

would not be adverse to the public interest. Scott v. Roberts, 612 F.3d 1279, 1290

---

account for the inequitable circumstances created by the COVID-19 pandemic.
Cooper, 472 F. Supp. 3d at 1297.

(11th Cir. 2010); Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005). A preliminary injunction is an extraordinary remedy which a court should grant only when the movant clearly carries the burden of persuasion as to each of the four prerequisites. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). The decision whether to grant preliminary injunctive relief is within the broad discretion of the district court. Democratic Party of Ga., Inc. v. Crittenden, 347 F. Supp. 3d 1324, 1339 (N.D. Ga. 2018).

"The likelihood of success on the merits is generally considered the most important of the four factors." Furman v. Cenlar FSB, No. 1:14-CV-3253-AT, 2015 WL 11622463, at *1 (N.D. Ga. Aug. 26, 2015) (citation and quotation omitted); see also Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986) ("Ordinarily the first factor is the most important."). The purpose of a preliminary injunction is to maintain the status quo until the court can enter a final decision on the merits of the case. Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011).

Finally, with respect to the showing of irreparable injury, the Eleventh Circuit has stated that "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th

21

Cir. 2016).  "Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on the merits." Id.

**B.   Discussion**

Even assuming that Plaintiffs have standing, the Court finds that Plaintiffs have failed to show a likelihood of success on the merits so as to support the granting of their motion for a preliminary injunction.

The First Amendment to the United States Constitution declares that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I.  "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010) (citing Buckley v. Valeo, 424 U.S. 1, 14-15 (1976)) ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.").  "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989) (internal punctuation and citation omitted).

22

"Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001); see also Ala. Democratic Conf. v. Broussard, 541 F. App'x 931, 932-33 (11th Cir. 2013) ("It is well-established that political contributions are considered to be political speech, and protected by the First Amendment."). In the context of political speech, the right of association and the right of expression are not analyzed in a vacuum. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 300 (1981) ("A limit on contributions in this setting need not be analyzed exclusively in terms of the right of association or the right of expression. The two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression."). "[T]he right of [political] association is a basic constitutional freedom . . . that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." Buckley, 424 U.S. at 25 (1976) (internal punctuation and citation omitted).

Nevertheless, the right to receive political contributions is not without the ability of a legislative body to impose some restriction.

The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute. Our

23

> cases have held that Congress may regulate campaign contributions to
> protect against corruption or the appearance of corruption.  At the same
> time, we have made clear that Congress may not regulate contributions
> simply to reduce the amount of money in politics, or to restrict the
> political participation of some in order to enhance the relative influence
> of others.

McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 191 (2014) (citations

omitted).  "Compared to restrictions on spending, which receive a higher level of

scrutiny, 'restrictions on political contributions have been treated as merely

'marginal' speech restrictions subject to relatively complaisant review under the

First Amendment, because contributions lie closer to the edges than to the core of

political expression."  Davis, 554 U.S. at 738 (quoting Fed. Election Comm'n v.

Beaumont, 539 US. 146, 161 (2003)).  Consequently, "[a] law limiting

contributions is valid 'if the State demonstrates a sufficiently important interest'

and the law is 'closely drawn' to serve that state interest, even if there is a

'significant interference' with political association."  Ala. Democratic Conf. v.

Att'y Gen. of Ala., 838 F.3d 1057, 1063 (11th Cir. 2016) (quoting Buckley, 424

U.S. at 25).  This standard is a "lesser demand" than strict scrutiny.  Id. (citing

Beaumont, 539 U.S. at 155).  "The goal of this 'less rigorous standard of review' is

to give the legislature 'sufficient room to anticipate and respond to concerns about

circumvention of regulations designed to protect the integrity of the political

process.'" Id. (quoting <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 137

(2003), <u>overruled on other grounds by</u> <u>Citizens United</u>, 558 U.S. 310).

In <u>Perdue v. Kemp</u>, this Court considered whether the plaintiffs in that case

were likely to succeed on their claim that, based on <u>Davis</u>, Georgians First's

expenditures in support of Governor Kemp's re-election during the primary were

violative of the First Amendment:

> O.C.G.A. § 21-5-34.2 effectively negates the contribution limit upon which all candidates for Governor in the primary election are bound for just one person: Governor Kemp, the incumbent. The new law leaves Perdue subject to a maximum contribution limit of $7,600 while Governor Kemp can raise unlimited contributions through his leadership committee, Georgians First. Therefore, whether this law passes constitutional muster depends on whether Defendants can demonstrate a sufficiently important state interest and, if so, whether the law is closely drawn to serve that interest.

<u>Perdue v. Kemp</u>, 2022 WL 710959, at *10. This Court then found that the state's

proffered interest, "transparency," was "not a sufficient legal justification for the

'unprecedented step of imposing different contribution . . . limits on candidates

vying for the same seat[.]'" Id. at *12 (quoting <u>Davis</u>, 554 U.S. at 743).

Additionally, the Court found that there was no indication that the state's interest

in enacting the LC Statute was the prevention or appearance of corruption, which

is the only recognized state interest sufficiently legitimate to justify any intrusion

upon political contributions. Id. Finally, this Court found that even if there was a

legitimate government interest, the LC Statute was not closely drawn to serve that interest.  Id.  That same reasoning is applicable to the facts of this case.

Because Graham and Jones are candidates for the same office, but because Jones is the nominee of a political party and Graham is not, Jones through his leadership committee can accept contributions in unlimited amounts, while Graham is subject to the $7,600 limit.  As this Court held in Perdue v. Kemp, this campaign finance scheme amounts to an impermissible restraint on speech:

> the Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," and has opined that "the unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment."

Perdue v. Kemp, 2022 WL 710959, at *9 (quoting Davis, 554 U.S. at 738, 743-44).  Accordingly, just like the plaintiffs did in Perdue v. Kemp and One Georgia v. Carr, Plaintiffs in this case are likely to be able to show that the LC Statute as applied to Graham is an impermissible infringement of Plaintiffs' First Amendment rights.

Nevertheless, Plaintiffs are not likely to succeed on the merits of their action with respect to injunctive relief because the remedy they seek is an injunction against Defendants that either requires Defendants to treat "political bodies" as the same as "political parties" for purposes of the LC Statute or precludes Defendants

from enforcing the LC Statute in its entirety.[3]  In other words, although Plaintiffs

seek a declaration that the LC Statute is unconstitutional as applied, they

paradoxically seek injunctive relief that would allow Graham to form a leadership

committee even though he is not the nominee of a political party as defined by

Georgia law.  Granting Plaintiffs' requested relief would require this Court to

effectively rewrite the LC Statute to permit all "political bodies" to form leadership

committees.  The Court is unable to rewrite the LC Statute in such a manner.  See

Va. v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988) (holding that courts

"will not rewrite a state law to conform it to constitutional requirements").

Plaintiffs in the instant case make the same mistake that initially was made

by the plaintiffs in One Georgia v. Carr; namely, to seek to have this Court rewrite

the LC Statute or take action that would not address the purported

unconstitutionality of the LC Statute.  One Georgia, 2022 WL 1284238, at *3.

Given this Court's express holding in Perdue v. Kemp, Plaintiffs in this case had

two options.  One of those options was to follow the framework established in

Perdue v. Kemp (and later in One Georgia v. Carr) and seek an injunction to

prevent the WBJ Leadership Committee from soliciting or receiving contributions.

---

[3] The Court is not clear how the latter proposed remedy serves Plaintiffs' purpose
or redresses the alleged inequity created by the LC Statute.

Plaintiffs instead chose a second, untenable option: to try to convince the Court to rewrite the LC Statute to permit them to raise unlimited funds under a statutory campaign finance scheme they allege is unconstitutional, and prevent an agency of the executive branch from enforcing an unambiguous Georgia law that provides that a political party nominee for Lieutenant Governor may establish a leadership committee and raise unlimited funds through that committee.

Accordingly, even if Plaintiffs had standing to seek the injunctive relief they request, the Court finds that Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of the relief they seek in their Complaint, which seeks to permit Graham to form a leadership committee in contravention of state law and under a statutory scheme that is likely unconstitutional as applied. Consequently, the Court finds that Plaintiffs are not entitled to their requested preliminary injunction and need not consider the other preliminary injunction factors.[4]  See Tiber Lab'ys, LLC v. Hawthorn Pharms., Inc., 527 F. Supp. 2d 1373,

---

[4] The Court notes that Graham filed his notice of candidacy as the Libertarian Party's candidate for Lieutenant Governor in March 2022, over six months prior to filing this lawsuit. See O.C.G.A. § 21-2-132(d)(2) (providing that candidates for state office must file a notice of candidacy "on the Monday of the thirty-fifth week immediately prior to the election and ending at 12:00 Noon on the Friday immediately following such Monday."). This Court's injunction in the Perdue case was entered one month prior to the filing of Graham's notice of candidacy, so there was no reason Plaintiffs could not have sought relief at any time after Graham became a candidate for Lieutenant Governor. And even if Plaintiffs were waiting

1378 (N.D. Ga. 2007) (quoting Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552,

1556 (Fed. Cir. 1994)) ("Because, irrespective of relative or public harms, a

movant must establish both a likelihood of success on the merits and irreparable

harm . . . the district court may deny a preliminary injunction based on the

movant's failure to establish either of these two crucial factors without making

additional findings respecting the other factors.").

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion

for Preliminary Injunction [Doc. 4] is **DENIED**.

**IT IS SO ORDERED** this 6th day of October, 2022.

_____
MARK H. COHEN
United States District Judge

---

to see if another candidate for Lieutenant Governor formed a leadership
committee, they allege that Jones did so on June 17, 2022, over two months prior
to the filing of this lawsuit. Plaintiffs' delay in filing this lawsuit somewhat
vitiates the notion of irreparable harm. See Pals Grp., Inc. v. Quiskeya Trading
Corp., No. 16-23905-CIV-GOODMAN, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9,
2017) ("[C]ourts typically decline to grant preliminary injunctions in the face of
unexplained delays of more than two months.") (internal quotation and citation
omitted); see also Millennium Funding, Inc. v. 1701 Mgmt. LLC, No. 21-cv-
20862, 2021 WL 3618227, at *9 (S.D. Fla. Aug. 16, 2021) (collecting cases
denying injunctive relief after plaintiff delayed for between two and twelve
months).